# Illinois Official Reports

## Appellate Court

---

### *Rocha v. FedEx Corp.*, 2020 IL App (1st) 190041

---

| | |
|---|---|
| Appellate Court Caption | CARLOS G. ROCHA and ARIZE 11, INC., Plaintiffs-Appellants, v. FEDEX CORPORATION, a Delaware Corporation; FEDEX GROUND PACKAGE SYSTEM, INC., a Delaware Corporation; DAVID F. REBHOLZ; RODGER G. MARTICKE; CLIFFORD P. JOHNSON; SCOTT RAY; NATHAN WATTS; RALPH STEPHENS; CHRISTINA GONZALEZ; RJC 57, INC.; DEER, STONE & MAYA, P.C.; JEFFREY DEER; MARK STONE; MARIA ROJAS; and DOES 1-50, Defendants (FedEx Corporation; FedEx Ground Package System, Inc.; David F. Rebholz; Rodger G. Marticke; Clifford P. Johnson; Scott Ray; Nathan Watts; Ralph Stephens; Christina Gonzalez; RJC 57, Inc.; Deer, Stone & Maya, P.C.; Jeffrey Deer; and Mark Stone, Defendants-Appellees). |
| District & No. | First District, Fourth Division<br>No. 1-19-0041 |
| Filed | March 26, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-506; the Hon. Sanjay T. Tailor and the Hon. Diane M. Shelley, Judges, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lisa D. Johnson, of Anchor Law Offices, PLLC, of Gurnee, for appellants. |

David L. Weinstein and Ryan S. Burandt, of Taft Stettinius & Hollister LLP, of Chicago, and John W. Campbell, of Memphis, Tennessee, for appellees FedEx Corporation, FedEx Ground Package System, Inc., Clifford P. Johnson, Rodger G. Marticke, Scott Ray, Nathan Watts, and David F. Rebholz.

Rebecca M. Rothmann, of Wilson Elser Moskowitz Edelman & Dicker LLP, of Chicago, for appellees Deer, Stone & Maya, P.C., Jeffrey W. Deer, and Mark Stone.

No brief filed for other appellees.

Panel            JUSTICE BURKE delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1 Plaintiffs, Carlos G. Rocha and Arize 11, Inc., appeal from various orders and judgments of the circuit court, including the court's decision to *sua sponte* strike their initial complaint, its denial of their motion for a substitution of judge, its dismissal of count VIII of their third amended complaint, and its grant of summary judgment in favor of a defendant on count II of their fourth amended complaint. All of the defendants, however, initially challenge our jurisdiction in this appeal. For the reasons that follow, we have jurisdiction in this appeal, and we affirm the judgments of the circuit court.

¶ 2                      I. BACKGROUND
¶ 3                      A. Rocha and FedEx
¶ 4 Plaintiff Rocha worked for FedEx as a delivery driver. In 2006, Rocha signed a standard operating agreement with FedEx, which allowed him to service two routes as an independent contractor. In 2007, Rocha signed a modified standard operating agreement with FedEx, which allowed him to be a "swing" driver, again as an independent contractor, and service routes when other drivers were on vacation or leave. In the spring of 2010, FedEx announced it was transitioning from an independent contractor model in its use of delivery drivers to an independent service provider (ISP) model, a transition prompted by lawsuits alleging that FedEx misclassified its drivers as independent contractors. Under the ISP model, FedEx would contract with incorporated entities that would be responsible for delivering to geographic areas larger than the previous areas for which independent contractors were responsible. Those incorporated entities would, in turn, employ the delivery drivers. In the summer of 2010, in connection with the transition, FedEx sent its drivers currently operating under standard operating agreements a transition guide. The guide described the transition and change to FedEx's business model and discussed the steps contractors could take to become ISPs, which

included creating an incorporated entity, acquiring service routes and completing a response to a FedEx request for information.

¶ 5 In late fall 2010, although Rocha's modified standard operating agreement was ending, he signed an extended standard operating agreement, in which he continued working with FedEx while the completion of the transition to the ISP model was ongoing. Also around this time, Rocha signed an agreement releasing FedEx from liability and claims related to the transition in exchange for financial compensation, though Rocha would later claim that he never received the compensation. Throughout all of this, Rocha desired to become an ISP and used plaintiff, Arize 11, Inc. (Arize 11), as the incorporated entity. During Rocha's efforts to become an ISP, he enlisted the help of two attorneys and their law firm. Rocha, using Arize 11, also attempted to acquire the necessary amount of service routes, and he executed a business agreement with John Velez to that end.

¶ 6 In late 2010 and into early 2011, Rocha's relationship with FedEx deteriorated. According to FedEx, Rocha had various issues with deliveries, including missing 53 delivery stops in one day; had various communication issues with supervisors; and was accused of sexual harassment. Ultimately, in late February or early March 2011, FedEx disqualified Rocha from performing deliveries. Later in March, Arize 11 sold its assets to another incorporated entity, though Rocha alleged the sale was coerced by several individuals working in concert with one another, including his own attorneys. Rocha also claimed that the sale price was less than to what he agreed. The allegations and causes of actions in this lawsuit arose from FedEx's transition to the ISP model, Rocha's business dealings with FedEx during such time, the representation from his attorneys, and the sale of Arize 11 assets.

¶ 7 B. Federal Court Litigation

¶ 8 In 2011, prior to the instant litigation, Rocha joined a federal lawsuit captioned Fluegel v. FedEx Ground Package System, Inc., No. l:05-cv-02326 (N.D. Ill.), in which FedEx delivery drivers principally alleged that FedEx had misclassified them as independent contractors and thus deprived them of the protections afforded by the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq.* (West 2010)). Following mediation, FedEx settled with the Fluegel plaintiffs, but not Rocha, who chose to be excluded from the settlement because he would have had to sign a release of all claims against FedEx that included any associated entities.

¶ 9 Thereafter, plaintiffs filed a lawsuit in federal court against FedEx, as well as several of the other defendants in the instant lawsuit, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.* (2012)), other federal laws, and Illinois laws. *Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 804-05 (N.D. Ill. 2014). In ruling on motions to dismiss filed by the defendants, the federal court found plaintiffs' complaint " 'an egregious violation' " of the federal pleading standards with its "sheer volume and repetitiveness" and the ubiquity of legal conclusions disguised as facts. *Id.* at 805-06 (quoting *Hartz v. Friedman*, 919 F.2d 469, 471 (7th Cir. 1990)). Ultimately, the federal court determined that plaintiffs failed to sufficiently state federal law claims for relief and, because of this, found no compelling reason to retain jurisdiction on their state law claims. *Id.* at 808-13. The federal court accordingly dismissed plaintiffs' complaint but allowed them leave to file an amended complaint "if they can address the fundamental deficiencies" of the complaint "in no more than 300 clear paragraphs that are not repetitive, speculative, or conclusory." *Id.* at 813.

Alternatively, the federal court observed that they "remain free to proceed in state court instead of trying to establish federal jurisdiction for this dispute where none may exist." *Id.* Plaintiffs ultimately chose the latter. But before they filed their action against FedEx in state court, Rocha filed a lawsuit against the attorneys who represented him in the Fluegel action for breach of contract, breach of fiduciary duties, fraud, and legal malpractice. *Rocha v. Rudd*, 826 F.3d 905 (7th Cir. 2016). That case was dismissed by the federal district court and affirmed on appeal by the Seventh Circuit Court of Appeals. *Id.* at 909, 912.

¶ 10                                            C. The Instant Litigation
¶ 11                                             1. Initial Complaint

¶ 12    In January 2015, plaintiffs filed their complaint in the circuit court against FedEx Corporation; FedEx Ground Package System, Inc.; David F. Rebholz; Rodger G. Marticke; Clifford P. Johnson; Scott Ray; Nathan Watts; Ralph Stephens; Christina Gonzalez; RJC 57, Inc.; Deer, Stone & Maya, P.C.; Jeffrey Deer; Mark Stone; Maria Rojas; and "Does 1-50."

¶ 13    FedEx Corporation (FXC) is the parent corporation to FedEx Ground Package System, Inc. (FXG), who sometimes does business as FedEx Ground or FedEx Home Delivery. The companies are in the business of providing package delivery and pick-up service throughout the United States (collectively, FedEx). At the time plaintiffs filed their complaint, Rebholz was the president and chief executive officer of FXG, Marticke was the executive vice president and chief operating officer of FXG, Johnson was the vice president and general counsel of FXG, Ray was a manager in FXG's contractor relations department, and Watts was senior manager for FXG's Chicago terminal (collectively, the FedEx defendants). RJC 57, Inc., is a dissolved corporation that was owned by Stephens and Gonzalez (collectively, the RJC defendants). Deer, Stone & Maya, P.C., is a dissolved law firm, and Deer and Stone were attorneys from the firm who represented plaintiffs in various matters related to their business with FedEx (collectively, the DSM defendants). Rojas is an accountant who was referred to plaintiffs by the DSM defendants, and she provided tax services for plaintiffs.

¶ 14    Although the allegations raised by plaintiffs in their initial complaint are quite complex, we briefly attempt to summarize them. Plaintiffs' causes of actions against the FedEx defendants involve the transition to the ISP model. Plaintiffs believed that, based on statements contained in the transition guide and oral assurances from employees of FedEx, if they met certain requirements by November 19, 2010, including acquiring three or more service routes, incorporating as an entity and upgrading their vehicle fleet, they would obtain the exclusive right to negotiate an agreement to become an ISP. Plaintiffs alleged that they made a substantial monetary investment in order to become an ISP, but the FedEx defendants never had the intent to negotiate with them fairly, failed to follow through with their obligations, and made numerous false and illusory promises to them in the process. Furthermore, plaintiffs alleged that Rocha was threatened by FedEx through Watts, including one time being beaten by two unknown assailants at Watts's direction, to sell all of their assets to an approved entity. Plaintiffs' claims against the DSM defendants and the RJC defendants centered around an alleged conspiracy by them, as well as Watts and Velez, to sell plaintiffs' assets at a discount to the RJC defendants with the DSM defendants retaining undue compensation from that transaction as well as legal files and business documents belonging to plaintiffs.

¶ 15    In plaintiffs' initial complaint, they raised nine causes of action. Count I was for breach of contract against FXG and the RJC defendants, specifically for breaching the extended

operating agreement. Count II was for breach of contract against FXG, specifically for breaching the transition guide, which plaintiffs alleged contained an offer from FXG that they accepted. Count III was for fraudulent inducement against FXG. Count IV was for promissory estoppel against FXG. Count V was for a violation of the Consumer Fraud and Deceptive Business Practices Act (Deceptive Practices Act) (815 ILCS 505/1 *et seq.* (West 2014)) against FXG, Watts, and the RJC defendants. Count VI was for a violation of the Business Opportunity Sales Law of 1995 (Opportunity Sales Law) (815 ILCS 602/5-1 *et seq.* (West 2014)) against all of the FedEx defendants. Count VII was for conspiracy to defraud and aiding and abetting such fraud against FXG, Watts, the RJC defendants, the DSM defendants and Rojas. Count VIII (though it was mistakenly labeled count VII) was for unjust enrichment against FXG, the RJC defendants, the DSM defendants, and Rojas. Lastly, count IX (though it was mistakenly labeled count VIII) was for conversion against FXG, Watts, the RJC defendants, the DSM defendants, and Rojas. In response, all of the FedEx defendants filed motions to dismiss.

¶ 16    In July 2015, the circuit court held a hearing on the motions to dismiss and struck plaintiffs' complaint *sua sponte*.[1] The court's written order did not explain why it did so, and there is no report of proceedings from the hearing. But, at subsequent hearings from which we have reports of proceedings, the court explained that the complaint was "incomprehensible," "long on conclusions," and "short on ultimate facts." The court allowed plaintiffs leave to amend their complaint and stayed discovery until they filed "an amended complaint that [was] sufficient." In light of its ruling, the court denied the motions to dismiss as moot.

¶ 17                        2. First and Second Amended Complaints

¶ 18    Two months later, plaintiffs filed a "Partially Amended Complaint." In count I, plaintiffs highlighted that the cause of action—breach of contract against FXG and the RJC defendants, specifically for breaching the extended operating agreement—had been stricken from their initial complaint and the cause was restated "for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." Count II was for breach of contract against FXG, specifically for breaching the transition guide, which plaintiffs alleged contained an offer from FXG that they accepted. Count III was for fraudulent inducement against FXG. Count IV was for promissory estoppel against FXG. In count V, plaintiffs highlighted that the cause of action—a violation of the Deceptive Practices Act against FXG, Watts, and the RJC defendants—had been stricken from their initial complaint and the cause was restated "for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." In count VI, plaintiffs highlighted that the cause of action—a violation of the Opportunity Sales Law against all of the FedEx defendants—had been stricken from their initial complaint and the cause was restated "for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." Count VII was for conspiracy to defraud and aiding and abetting such fraud against Watts, FXG, the DSM defendants, and Rojas but no longer against the RJC defendants. Count VIII was for conversion against FXG, Watts, and the DSM defendants but no longer against the RJC defendants. Lastly, count IX was for a violation of the Opportunity Sales Law against FXG. Though plaintiffs named Watts in multiple counts, he was not named in the caption or identified by full name or position anywhere in the amended complaint.

_____

[1]Judge Sanjay T. Tailor presided over this case from its inception until March 2017.

¶ 19    In response, FXG and the DSM defendants filed motions to dismiss. Rojas also filed one *pro se*. In October 2015, the circuit court held a hearing, where plaintiffs informed the court that it would not amend the counts stricken from the initial complaint alleged against FXC, Rebholz, Marticke, Johnson, Ray, Watts, or the RJC defendants and sought a dismissal with prejudice against those defendants for purposes of appeal. The court accordingly granted plaintiffs' request and dismissed those defendants with prejudice. The remaining defendants—FXG, the DSM defendants, and Rojas—and plaintiffs continued briefing on the various motions to dismiss.

¶ 20    In February 2016, plaintiffs filed a motion for a substitution of judge as of right, arguing that the request was proper because the trial judge had not yet ruled on any substantive issue in the case. Plaintiffs acknowledged the various orders entered thus far but argued that they were a mix of nonsubstantive and noncontested orders that did not reach the merits of any aspect of the case.

¶ 21    At a hearing, the circuit court ruled on plaintiffs' motion for substitution of judge and the various defendants' motions to dismiss. Regarding plaintiffs' motion, the court found that, although it did not grant any defendant's motion to dismiss, it did *sua sponte* strike their initial complaint as being incomprehensible, long on conclusions, and short on ultimate facts. The court concluded that such a ruling was substantive and as if it had considered and granted a motion to dismiss. The court added that, even if its ruling was not substantive, it believed that the purpose of plaintiffs' motion was to "test[ ] the waters" and found denying the motion to be warranted on that basis, as well. The court therefore denied the request for a substitution of judge. Regarding the motions to dismiss, the court granted the motions filed by the DSM defendants and Rojas, finding the allegations against them to be "entirely conclusory" and lacking in "specific facts pled." The court, however, allowed plaintiffs leave to replead those causes of action. Regarding FXG's motion to dismiss, the court granted the motion on counts VII through IX, but denied the motion on counts II through IV.

¶ 22    In March 2016, plaintiffs filed their "Second Partially Amended Complaint" against FXG, the DSM defendants, and Rojas, to which the defendants again filed motions to dismiss. Several months later, the circuit court granted plaintiffs leave to file another amended complaint.

¶ 23                                        3. Third Amended Complaint

¶ 24    In February 2017, plaintiffs filed their "Third Partially Amended Complaint." In count I, plaintiffs highlighted that the cause of action—breach of contract against FXG and the RJC defendants, specifically for breaching the extended operating agreement—had been stricken from their initial complaint and the cause was restated "without incorporation into amended counts, for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." Count II was for breach of contract against FXG, specifically for breaching the transition guide, which plaintiffs alleged contained an offer from FXG that they accepted. Count III was for fraudulent inducement against FXG. Count IV was for promissory estoppel against FXG. In count V, plaintiffs highlighted that the cause of action—a violation of the Deceptive Practices Act against FXG, Watts, and the RJC defendants—had been stricken from their initial complaint and the cause was restated "without incorporation into amended counts, for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." In count VI, plaintiffs highlighted that the cause of action—a violation of the Opportunity Sales Law against

all of the FedEx defendants—had been stricken from their initial complaint and the cause was restated "without incorporation into amended counts, for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." Count VII was for breach of contract against Rojas.

¶ 25    Count VIII, which is relevant to this appeal, was for conversion against the DSM defendants and Rojas. In the count, plaintiffs alleged that, in September or October 2010, Rocha sought legal assistance from Stone related to FedEx's ISP transition under a prepaid legal services plan with LegalShield. Stone, in turn, assigned Deer to the matter. In November 2010, Rocha allegedly retained the DSM defendants to represent Arize 11 against threats of wrongful termination by FXG and paid the law firm a $2500 retainer toward anticipated litigation not covered by the prepaid plan. Months later, the DSM defendants allegedly agreed to file a cause of action against FXG on behalf of Arize 11 for breach of contract based on FXG wrongfully taking from Arize 11 service routes and underlying propriety interests. But the DSM defendants eventually did not file any lawsuit on plaintiffs' behalf. According to plaintiffs, unbeknownst to them, the DSM defendants had already agreed to represent Velez in another matter that directly conflicted with plaintiffs' interests. Plaintiffs claimed that, around this time, the DSM defendants "persuaded" Rocha to replace his current accountants with Rojas, who allegedly was Velez's accountant. But plaintiffs alleged that Deer and Rojas "merely sought to gain greater control over Plaintiffs and unfettered access to their books and records" in order to help Velez and "never intended" to provide services to plaintiffs.

¶ 26    Plaintiffs further alleged that Deer contacted Rocha and informed him that Rojas had discovered various issues with his and Arize 11's business and, in turn, Rojas needed their tax returns and business documents. Rocha complied and delivered the various documents to Deer, who allegedly transferred some or all of those documents to Rojas "without Rocha's consent." By March 2011, when Rocha had allegedly been forced to sell the assets of Arize 11, plaintiffs claimed they had made multiple demands of the DSM defendants for the sale agreement, related documents, and unrelated documents, but the DSM defendants never complied. Although Rojas returned some documents to plaintiffs, she and the DSM defendants allegedly retained other important documents, the purpose of which plaintiffs claimed was to help with the DSM defendants' representation of Velez.

¶ 27    Beyond the retention of documents, plaintiffs made various accusations regarding the sale of Arize 11's assets. Plaintiffs stated that, in early March 2011, Rocha executed a letter of intent on Arize 11's behalf to sell four service routes and six vehicles to a company called RJC 80, Inc., for $220,000. Despite this, plaintiffs claimed that Rocha never received a sale agreement or notice about when the sale was going to be consummated. Rocha alleged that he only learned the sale had been completed after the fact and that the terms he had agreed to were never effectuated. According to plaintiffs, the DSM defendants sold Arize 11's assets to a company owned by defendant Stephens for $165,000, which was far less than the price Rocha agreed to of $220,000.[2]

¶ 28    After the sale, the DSM defendants deposited the $165,000 into a client trust fund. According to an accounting from them, which plaintiffs attached to their complaint, only $40,000 went to Rocha. The accounting showed that, after the DSM defendants paid various

---

[2]The DSM defendants claimed that, while $220,000 had been agreed to initially, there was an issue selling one of the service routes, which resulted in the lower sale price.

expenses of Arize 11's, including multiple loans, the DSM defendants retained a total of $29,500 in purported legal fees. Plaintiffs stated that, after Rocha learned about the DSM defendants' "side dealings" with Velez and "false representation that it had filed a lawsuit against [FXG] when it had not," they terminated the representation of the DSM defendants and demanded the return of all their files and all money held in trust for them. Plaintiffs claimed that they continued to make demands, but the DSM defendants withheld all their files and money. Plaintiffs also stated that they requested invoice narratives justifying the DSM defendants' fees but never received any documentation. Plaintiffs asserted that, as prepaid LegalShield customers, they were entitled to unlimited services and never agreed to any additional legal fees beyond the $2500 retainer.

¶ 29    In count IX, plaintiffs highlighted that the cause of action—a violation of the Opportunity Sales Law against FXG—had been dismissed without prejudice from their first partially amended complaint was restated "without incorporation into amended counts, for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." Count X was for breach of contract against FXG, specifically for breaching an addendum to the extended operating agreement. Count XI was for a violation of the Wage Act against FXG.

¶ 30    Afterward, Rojas, now with the assistance of counsel, filed a motion to dismiss both counts against her (counts VII and VIII), and FXG filed a motion to dismiss counts X and XI. Additionally, the DSM defendants filed a motion to dismiss count VIII, the only count against them, under section 2-619(a)(5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(5) (West 2014)). They argued that plaintiffs' cause of action against them was barred by the two-year statute of limitations contained in section 13-214.3(b) of the Code (*id.* § 13-214.3(b)) for "[a]n action for damages based on tort, contract, or otherwise (i) against an attorney arising out of an act or omission in the performance of professional services." The DSM defendants contended that, in a May 10, 2012, termination letter sent by Rocha to them, which they attached to their motion, Rocha lobbied "complaints identical to each of those set forth" in the third partially amended complaint. Because of the termination letter, the DSM defendants argued that plaintiffs' cause of action against them accrued no later than May 10, 2012, yet plaintiffs filed their lawsuit in January 2015.

¶ 31    In the termination letter, dated March 10, 2012, Rocha remarked that "[f]or months, I have requested that you," Deer, "return all business records and legal files in your possession relating to your work for Arize 11, Inc." yet he had received nothing. Rocha also asserted that, in addition to these documents, he had "further made multiple demands that you return any and all funds held by you on my behalf and/or paid by me as a retainer for legal services you never provided." Rocha continued that, in February 2011, he paid Deer $2500 "to handle Arize 11, Inc.'s sale of substantially all its assets to a Ralph Stephens," which was supposed to be for $220,000 yet "a purported 'sale agreement' " that Deer provided him only showed that Stephens paid $165,000. Rocha remarked that, regardless of this issue, he believed that Deer was improperly withholding "no less than $58,426.72 of Arize 11, Inc.'s money from the sale of its assets." Rocha asserted: "I intend to challenge any amounts withheld from my retainer by you as compensation for legal services purportedly provided me or Arize 11, Inc." Rocha also highlighted the lawsuit against FedEx that he wanted and believed Deer had filed but stated he was "shocked to find no action filed *** in any Illinois state or federal court." Based on the foregoing issues, Rocha asserted that he "no longer trust[ed] [Deer] to represent" him

or Arize 11 and terminated their relationship. Rocha demanded his "files and transaction documents" and for Deer to "return the retainer paid."

¶ 32    On May 16, 2017, the circuit court held a hearing on the various motions to dismiss. In a written order, the court dismissed counts VII and VIII against Rojas with prejudice. The court also dismissed count VIII against the DSM defendants with prejudice, finding the action was barred by the applicable two-year statute of limitations. Lastly, the court denied FXG's motion to dismiss count X but reserved ruling on FXG's motion regarding count XI and required supplemental briefing on that count. The following month, after supplemental briefing, the court dismissed count XI against FXG but granted plaintiffs leave to amend that count as well as "modify or 'clean-up' any other count or allegations" contained in the third partially amended complaint.

¶ 33                                    4. Fourth Amended Complaint

¶ 34    In July 2017, plaintiffs filed a "Fourth Amended Complaint," only amending certain counts against FXG. In count I, plaintiffs highlighted that the cause of action—breach of contract against FXG and the RJC defendants, specifically for breaching the extended operating agreement—had been stricken from their initial complaint and the cause was restated "without incorporation into amended counts, for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal."

¶ 35    Count II, which is relevant for this appeal, was for breach of contract against FXG. In that count, plaintiffs alleged that, in the summer of 2010 after FXG announced that it was transitioning from the independent contractor model to the ISP model, Earl Miller of FXG held a meeting with FedEx drivers, including Rocha, and distributed the transition guide. The transition guide described the steps a contractor endeavoring to become an ISP had to take, including acquiring three or more service areas or routes, upgrading and acquiring vehicles to service those routes, and incorporating as an entity, all by November 19, 2010. Plaintiffs claimed that the transition guide contained an offer that, if accepted, would entitle them to an exclusive right to negotiate an ISP with FXG and created an enforceable contract right to that effect. As part of the transition to the ISP model, plaintiffs claimed that FXG "demanded" that they sign a release of claims agreement, and when they refused, defendant Watts told Rocha that Arize 11 would never become an ISP. Thereafter, plaintiffs were allegedly "subjected to a continuous stream of complaints." Overall, according to plaintiffs, despite meeting the conditions listed in the transition guide, FXG did not negotiate an ISP agreement with them. In connection with FXG's failure to negotiate with plaintiffs, they claimed that FXG breached its duty of good faith and fair dealing.

¶ 36    Count III, which is relevant for this appeal, was for fraudulent inducement against FXG. In the count, plaintiffs claimed that, despite FXG's representations of its intent to negotiate an ISP agreement with them, FXG never had such an intent. Rather, according to plaintiffs, FXG's promise to negotiate was "part of a broader scheme to defraud Rocha into executing a release of claims" and make him liable for all costs associated with the ISP transition. At the time that plaintiffs were acquiring routes and preparing to become an ISP, they claimed that FXG "had already identified Rocha as one of a list of contractors it intended to terminate and had no intent whatsoever to negotiate or ever award him an ISP Agreement." Furthermore, according to plaintiffs, FXG had already initiated and pursued plans to assign routes belonging to Arize 11 to another entity.

¶ 37    Count IV, which is also relevant for this appeal, was for promissory estoppel against FXG. In the count, plaintiffs alleged that they acted in various manners upon reliance of FXG's promises and representations in connection with the alleged offer contained in the transition guide. These actions included signing a release of claims, entering into a business agreement with Velez, and expending over $100,000 to meet the requirements of an ISP.

¶ 38    In count V, plaintiffs highlighted that the cause of action—a violation of the Deceptive Practices Act against FXG, Watts, and the RJC defendants—had been stricken from their initial complaint and the cause was restated "without incorporation into amended counts, for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." In count VI, plaintiffs highlighted that the cause of action—a violation of the Opportunity Sales Law against all of the FedEx defendants—had been stricken from their initial complaint and the cause was restated "without incorporation into amended counts, for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." There were no counts VII or VIII, as the circuit court dismissed those counts against Rojas and the DSM defendants. In count IX, plaintiffs highlighted that the cause of action—a violation of the Opportunity Sales Law against FXG—had been dismissed without prejudice from their first partially amended complaint and the cause was restated "without incorporation into amended counts, for the sole purpose of preserving Plaintiffs' objection for reconsideration or appeal." Count X was for breach of contract against FXG, specifically for breaching the extended operating agreement. Count XI was for a violation of the Wage Act against FXG.

¶ 39    Thereafter, FXG filed a motion for partial summary judgment on counts II, III, IV, and part of count X. Concerning count II, FXG argued that the transition guide contained no offer and, regardless if it did contain an offer, plaintiffs failed to satisfy the condition precedents listed in the transition guide, such as submitting a response to a request for information and securing insurance coverage. As such, FXG posited that it was entitled to judgment as a matter of law on that count.

¶ 40    On August 9, 2018, after briefing had been completed on FXG's motion and with a jury trial approximately two weeks away, the circuit court held a hearing on the motion. During the hearing, concerning count II, the court focused on whether the transition guide contained an offer. After various arguments from the parties on the issue, the court stated "I'm prepared to rule on Count 2." The court continued: "As to Count 2, the Court finds as a matter of law that the [transition] guide does not constitute a contract" and, based on the "four corners of the document, ***[the transition guide was] not intended to be an offer." The court added that it "intent[ed] to reduce all of this to writing, but given the time constraints that [it] had" and the parties' desire to have "rulings so that they could properly prepare for trial, which is right around the corner," it wanted the rulings known.

¶ 41    The parties then moved on to counts III, IV, and X. After the parties argued on count X, the court stated that it was "granting the motion for summary judgment" on part of count X. Given its rulings on counts II and X, the court observed that "what [it has] to rule on at this point is the promissory estoppel and the fraudulent inducement" claims (counts IV and III, respectively). On count III, the court stated that it was "going to have to deny the motion." And on count IV, the court noted that, due to its ruling that the transition guide did not constitute a contract or offer, plaintiffs were proceeding based on oral representations from employees of FedEx. And the court allowed plaintiffs to proceed to trial based on the oral representations from FedEx. The court added that plaintiffs could introduce the transition guide as evidence

- 10 -

"[i]n the proper context and with the proper foundation" in support of its allegations in count IV. After concluding its hearing on FXG's motion for partial summary judgment, the court reiterated that, while it had "made certain pronouncements," it "would like to reduce this to writing so everyone will have a complete analysis of how [it] reached [its] rulings." To this end, the court requested a transcript from the hearing and remarked that it would "reduce [the oral pronouncements] to writing on or prior to the trial." The court concluded by stating "[a]t a minimum, you do know what [its] rulings are and that will assist you in preparing for trial." The court ultimately did not enter a written order, and the court's law record book does not contain any notation about a judgment being entered on August 9, 2018.

¶ 42    Approximately two weeks later, the jury trial commenced on counts III, IV, part of X and XI. On August 31, 2018, the jury returned a verdict in favor of FXG on all four counts. Later that day, the circuit court entered judgment for FXG.

¶ 43                                              5. Posttrial

¶ 44    In late September 2018, FXG moved for costs in connection with the trial. On October 5, 2018, plaintiffs filed a motion to vacate the judgment entered on August 31, 2018, and to extend the time to file their posttrial motion for relief. In the motion in relevant part, plaintiffs acknowledged FXG's motion for costs and stated that, "[o]n August 9, 2018, this Court granted [FXG's] motion for summary judgment as to Count 2" but that "[a]n order or judgment, however, has yet to be entered and filed by the Court." Additionally, plaintiffs argued that the August 31, 2018, judgment did not properly dispose of counts I, V, or VI in their initial complaint or count II of their fourth amended complaint. Given all of this, plaintiffs contended that there had yet been a final judgment disposing of all counts and, thus, their motion was proper. They requested an extension to file their posttrial motion "for a period of 30 days after a final order or judgment is entered disposing of all Counts, including but not limited to Count 2."

¶ 45    Ten days later, FXG filed a motion seeking the entry of an order *nunc pro tunc* to reflect the circuit court's grant of summary judgment on count II. FXG conceded that "[a]n order reflecting the Court's oral ruling granting [it] summary judgment on Count 2 was not entered because the Court then-planned to later issue a written opinion." FXG, however, argued that the transcript of the hearing "clearly" showed the court granting its motion for summary judgment on count II. FXG posited that, because more than 30 days had passed since the court's "final judgment" was entered on August 31, 2018, it did not have jurisdiction "over this matter." But FXG argued that the court may enter a *nunc pro tunc* order at any time to correct a clerical error or matter of form even without jurisdiction.

¶ 46    Plaintiffs responded to FXG's motion, arguing that the circuit court's oral pronouncement on count II made "unequivocally clear" that it did not and never intended to enter judgment against them. Plaintiffs added that the court's oral pronouncement on count II "merely granted [FXG's] request for certain rulings of law with respect to the ISP Transition Guide and did so for the express and primary purpose of providing the parties guidance on the matter going into trial." Plaintiffs further highlighted that the court never stated that FXG's motion for summary judgment on count II was "granted." Plaintiffs posited that, in light of the transcript, there was no clerical error that needed to be corrected and therefore a *nunc pro tunc* order was inappropriate. Plaintiffs also responded to FXG's motion for costs.

¶ 47    Later, FXG filed a motion opposing plaintiffs' motion to vacate and extend the time to file their posttrial motion. FXG argued that, because plaintiffs' motion was filed more than 30 days after the circuit court entered the final judgment in the case on August 31, 2018, the court lacked jurisdiction to extend the time for them to file their posttrial motion. FXG acknowledged its own motion for costs was outside the 30-day window but posited that its motion was not directed against the judgment because it was the prevailing party at trial and its motion did not challenge the jury's verdicts. FXG therefore asserted that its motion for costs did not extend the time for plaintiffs to file their posttrial motion. FXG also argued that count II of plaintiffs' fourth amended complaint was "clearly" disposed of when the court orally granted FXG's motion for summary judgment on that count. Lastly, FXG contended that, because plaintiffs chose not to replead counts I, V, or VI in their initial complaint, the court's judgment of August 31, 2018, disposed of "all then-remaining counts."

¶ 48    Ultimately, on December 5, 2018, the circuit court held a hearing to address the various open motions. In arguing that the court lost jurisdiction over the case, FXG highlighted that, during the jury instructions conference on August 29, 2018, plaintiffs' attorney had "professed confusion" if "the Court had, in fact, entered summary judgment on Count 2." FXG asserted that the court responded and "stated succinctly, no, there was no confusion." FXG added this fact was further confirmed by the court informing plaintiffs' attorney that "instructions on Count 2 were not appropriate because that count was not submitted to the jury." Plaintiffs' attorney did not dispute FXG's assertions. FXG further highlighted plaintiffs' concession in their motion to vacate that the court " 'granted' " FXG's motion for summary judgment as to count II on August 9, 2018, and argued this was a "judicial admission." FXG concluded that an order *nunc pro tunc* to reflect the actual date the court granted summary judgment on count II was proper. In response, plaintiffs posited that a ruling in FXG's favor would "deprive Plaintiffs of due process, and of notice, and of the right to appeal retroactively." Plaintiffs also noted the circuit court's statement of intent to enter a written order "at a later time," meaning the oral rulings "did not finalize [the court's] intent of granting summary judgment." Plaintiffs concluded that "there is a judicial action that is missing here, and that is the entry of judgment."

¶ 49    Following the parties' argument, the circuit court remarked that "there are often rulings made by a Judge that cannot be reduced to writing because of just the volume of work." And "once the Court makes an oral pronouncement in open court, the only concern is whether or not it was clear enough for the parties to understand, and whether or not the parties were prejudiced in any way, and *** whether or not the parties understood the scope of the ruling." The court found that, based on its review of the transcript from that hearing, "there's no question" that its "ruling was extremely clear" and "you obviously understood the scope." Moreover, the court noted that, by the time the jury instructions conference had been completed, plaintiffs also knew of the court's ruling. The court accordingly entered an order *nunc pro tunc* on FXG's motion for summary judgment on count II as of August 9, 2018. The court also found that, because counts I, V, and VI of plaintiffs' initial complaint had been stricken by the original trial judge and not replead substantively, but only for purposes of preserving appeal rights, "there [was] nothing that need[ed] to be ruled upon" for those three counts. Based on the foregoing, the circuit court denied plaintiffs' motion to vacate and extend the time to file its posttrial motion. Lastly, the court granted FXG's motion for costs.

¶ 50    On January 4, 2019, plaintiffs filed their notice of appeal, appealing in pertinent part the circuit court's *sua sponte* striking of their initial complaint, the court's denial of their motion

for a substitution of judge, the court's grant of the DSM defendants' motion to dismiss count VIII of their third partially amended complaint, and the court's grant of FXG's motion for partial summary judgment on counts II, III, and IV of their fourth amended complaint.

## II. ANALYSIS

On appeal, plaintiffs contend that the circuit court erred in several manners. First, they argue that the court erred in *sua sponte* striking their initial complaint. Second, they argue that the court erred in denying their motion for a substitution of judge. Third, plaintiffs argue that the court erred in dismissing their cause of action against the DSM defendants based on a statute of limitations violation. Finally, they argue that the court erred in granting FXG's partial motion for summary judgment on counts II, III, and IV.

### A. Appellate Jurisdiction

All of the defendants posit that we cannot reach the merits of these contentions because we lack jurisdiction in the matter where plaintiffs failed to file a timely posttrial motion and notice of appeal. During the briefing of this appeal, several of the defendants filed motions to dismiss the appeal based on these same reasons. A different panel of this court denied those motions and allowed the case to be fully briefed. The denial of a motion to dismiss an appeal is not final and "[t]he panel that hears the appeal has an independent duty to determine whether it has jurisdiction and to dismiss the appeal if it does not." *In re Estate of Gagliardo*, 391 Ill. App. 3d 343, 348-49 (2009). Therefore, despite the prior orders denying multiple motions to dismiss, we must still consider our jurisdiction in this matter.

A timely filed notice of appeal is mandatory and jurisdictional. *Won v. Grant Park 2, L.L.C.*, 2013 IL App (1st) 122523, ¶ 20. If a notice of appeal is untimely filed, we have no choice but to dismiss the appeal. *Id.* Plaintiffs have appealed pursuant to Illinois Supreme Court Rule 303 (eff. July 1, 2017). According to Rule 303(a)(1), a party must file its notice of appeal "within 30 days after the entry of the final judgment appealed from, or, if a timely posttrial motion directed against the judgment is filed, whether in a jury or a nonjury case, within 30 days after the entry of the order disposing of the last pending postjudgment motion directed against that judgment or order." Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). In jury cases, a posttrial motion must be filed within 30 days after the entry of judgment or within any other timeframe as allowed by the circuit court, so long as the court allows such an extension within the initial 30-day window or any extension period. 735 ILCS 5/2-1202(c) (West 2014). And in nonjury cases, a postjudgment motion must be filed within 30 days after the entry of judgment or within any other timeframe as allowed by the circuit court, so long as the court allows such an extension within the initial 30-day window or any extension period. *Id.* § 2-1203(a). Stated otherwise, "after the 30-day period has expired, or the extended period of time has expired, without the entry of a new order setting a new deadline, the [circuit] court loses jurisdiction over the case." *Trentman v. Kappel*, 333 Ill. App. 3d 440, 442 (2002).

Defendants in this case argue that, because plaintiffs never received an extension of time to file a posttrial motion, their motion filed on October 5, 2018, was untimely and thus their notice of appeal filed on January 4, 2019, was also untimely because the final judgment in the case occurred on August 31, 2018, when the circuit court entered judgment on the jury's verdicts. Defendants therefore argue that we have no jurisdiction to hear this appeal. Although defendants acknowledge the court's December 5, 2018, entry of an order *nunc pro tunc* on

FXG's motion for summary judgment on count II, they posit that, because it was an order *nunc pro tunc*, the order was deemed effective August 9, 2018, when the court made its oral ruling with respect to the motion. Thus, defendants posit that the December 5, 2018, date has no bearing on the timeliness of plaintiffs' appeal.

¶ 57    Meanwhile, plaintiffs assert that, under Illinois Supreme Court 272 (eff. Jan. 1, 2018), the oral ruling by the circuit court on FXG's motion for summary judgment was not entered of record for purposes of calculating the time to appeal. In relevant part, Rule 272 provides:

> "If at the time of announcing final judgment the judge requires the submission of a form of written judgment to be signed by the judge or if a circuit court rule requires the prevailing party to submit a draft order, the clerk shall make a notation to that effect and the judgment becomes final only when the signed judgment is filed. If no such signed written judgment is to be filed, the judge or clerk shall forthwith make a notation of judgment and enter the judgment of record promptly, and the judgment is entered at the time it is entered of record." *Id.*

Rule 272 was intended "to eliminate confusion as to the finality of judgments [citation] and resolve questions of timeliness of appeals where there is an oral announcement of judgment from the bench." *Northern Illinois Gas Co. v. Martam Construction Co.*, 240 Ill. App. 3d 988, 991 (1993). In light of the language of Rule 272, "an oral pronouncement of judgment was not considered entered when rendered, but rather was considered entered when the oral judgment was entered of record." *Williams v. BNSF Ry. Co.*, 2015 IL 117444, ¶ 41. The term "entered of record" has been construed to mean when a judgment " 'is recorded in the law record book.' " *Id.* ¶ 42 (quoting *Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill. App. 3d 971, 984 (1975)).

¶ 58    For example, in *Williams*, 2015 IL 117444, ¶ 12, following argument on the defendant's posttrial motion, the circuit court orally stated that the motion was denied with the exception of one issue on which it reserved ruling. The court then stated: " 'I will issue an order on that probably within the next ten days or so and my clerk will let you know when that's ready for pickup.' " *Id.* Ultimately, the court did not enter a written order, and the oral pronouncement was not entered in the law record book. *Id.* ¶¶ 12, 45. Two months later, the court heard additional argument on the issue it reserved ruling on, denied the motion, and directed the parties to prepare an order. *Id.* ¶ 15. The court's written order explicitly referred to denying the motion as it related to the remaining issue. *Id.* ¶ 16. The defendant filed a notice of appeal within 30 days of the court's written order, but 72 days after the court's oral ruling on the posttrial motion regarding the majority of the posttrial issues. *Id.* ¶ 18. On appeal, the appellate court dismissed the appeal for a lack of jurisdiction, finding that the defendant failed to file its notice of appeal within 30 days of the circuit court's oral ruling. *Id.* ¶ 21.

¶ 59    The defendant appealed further to our supreme court, who initially observed that the appellate court had "perplexing[ly]" concluded that the circuit court's oral ruling constituted "entry of record" given that a judgment is entered of record only when it has actually been entered into the law record book. *Id.* ¶¶ 37-38, 42-45. Given the settled law on this matter, our supreme court found that the circuit court's "oral ruling *** did not enter that judgment of record" as that oral ruling "was not entered of record in the law record book." *Id.* ¶ 45. Ultimately, the supreme court determined that the time for the defendant to file its notice of appeal commenced when the circuit court entered the written order on the remaining posttrial issue because, although the written order only referred to the remaining posttrial issue, the law

- 14 -

record book showed an entry related to denying the defendant's entire posttrial motion. *Id.* ¶¶ 51-52. Thus, according to our supreme court, the defendant timely filed its notice of appeal and the appellate court incorrectly dismissed the appeal for a lack of jurisdiction. *Id.* ¶ 52.

¶ 60　　Similar to *Williams*, in this case, although the circuit court may have made an oral ruling on FXG's motion for summary judgment on August 9, 2018, a review of the law record book does not show that the ruling was entered of record that date nor does it show an entry of record on FXG's motion for summary judgment on any dates later that week. The first entry in the law record book after August 9, 2018, was on August 14, 2018, when FXG filed motions *in limine* prior to trial. Thus, under *Williams*, absent an entry of record of the court's judgment on FXG's motion for summary judgment, there was no judgment entered on the motion concerning count II. The confusion lies in the fact that, while the court clearly made its intention known that it was granting summary judgment on count II, it was not clear that its pronouncement was to be taken as the judgment. "Before a pronouncement should be taken as the judgment, it must be clear that it was intended as such and not merely an announcement of the opinion of the court or an indication of what the judgment is going to be." (Internal quotation marks omitted.) *Stoermer v. Edgar*, 104 Ill. 2d 287, 293-94 (1984). Here, the court expressly informed the parties that, despite its oral pronouncement, it would issue a formal written judgment encapsulating its oral pronouncements. "In the time between the announcement of judgment and the entry of the formal order contemplated, the judgment cannot be 'attacked by motion, appealed from, or enforced.' " *Ferguson v. Riverside Medical Center*, 111 Ill. 2d 436, 441 (1985) (quoting *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 538-39 (1984)).

¶ 61　　Illustrative is *Stoermer*, 104 Ill. 2d at 289, where a plaintiff sued the secretary of state to have his full driving privileges restored. In a hearing in the circuit court, the court "announced [its] decision *** to restore [the plaintiff's] full driving privileges" and directed the plaintiff's attorney to prepare a written order. *Id.* In an order entered following the hearing, the court stated that the secretary of state " 'is hereby ordered to issue to the plaintiff full driving privileges upon meeting usual requirements ***. FORMAL ORDER TO FOLLOW.' " *Id.* at 289-90. Afterward, the secretary of state filed a notice of appeal and the following day, the court entered the "formal typewritten order" contemplated following the hearing. *Id.* at 290. On appeal, the appellate court dismissed the secretary of state's appeal finding its notice of appeal premature. *Id.* at 291. Our supreme court agreed and relied on Rule 272, finding that, because the secretary of state filed its notice of appeal before the "final, formal typewritten order or judgment was entered," the notice was premature and the appellate court lacked jurisdiction over the appeal. *Id.* at 291-94.

¶ 62　　In this case, the circuit court explicitly made its intention known that it was going to "reduce" the oral pronouncements "to writing." Just as in *Stoermer*, where the court contemplated a formal written order to follow the announcement of judgment, the announcement could not be attacked by motion or appealed from. See also *Ferguson*, 111 Ill. 2d at 441 (stating that, between the announcement of a judgment and the entry of the formal contemplated order, that judgment cannot be attacked by motion or appealed from). And under Rule 272, because the court never entered an oral pronouncement of August 9, 2018, of record, the oral pronouncement granting summary judgment on count II did not constitute the judgment on that count. Rather, the entry of the formal written order on December 5, 2018, was when the judgment on count II was entered for purposes of appeal. Although on this date

the court entered judgment on count II *nunc pro tunc* as of August 9, 2018, such an order cannot be used where no judgment was actually entered of record. See *Grissom v. Buckley-Loda Community Unit School District No. 8*, 11 Ill. App. 3d 55, 58-59 (1973) (finding a *nunc pro tunc* order inappropriate because the circuit court cannot "under the guise of correcting its record, put upon it an order or judgment which never in fact had been made or entered"). Moreover, "[a]lthough a *nunc pro tunc* order relates back to the time of the order it corrects, it does not relate back to the extent that it would be impossible to file a notice of appeal within the time required by supreme court rules." *Ally Financial Inc. v. Pira*, 2017 IL App (2d) 170213, ¶ 30.

¶ 63    Given that plaintiffs filed their notice of appeal on January 4, 2019, within 30 days of December 5, 2018, the date the final judgment was entered in this case, plaintiffs' appeal was timely under Rule 303(a)(1) and conferred jurisdiction onto this court. We now turn to plaintiffs' contentions on appeal.

¶ 64                    B. *Sua Sponte* Striking of Plaintiffs' Initial Complaint

¶ 65    Plaintiffs first contend that the circuit court erred in *sua sponte* striking their initial complaint in its entirety where their pleading was sufficient in form and substance, and stated cognizable causes of action for breach of contract (count I), a violation of the Deceptive Practices Act (count V) and a violation of the Opportunity Sales Law (count VI). FXG, however, argues that the court's striking of plaintiffs' initial complaint with leave to amend is not reviewable because it was not a procedural step in the progression leading to the entry of the final judgment where plaintiffs chose to amend their complaint. Despite plaintiffs amending their initial complaint multiple times, they referred to the stricken counts in all subsequent complaints by including a paragraph regarding those causes of action. See *Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 36 (finding that a plaintiff can preserve for review dismissed counts by filing "an amended pleading that *** refers to the dismissed counts" and a paragraph or footnote is sufficient). The stricken causes of action are thus reviewable on appeal.

¶ 66    Under section 2-603(a) of the Code (735 ILCS 5/2-603(a) (West 2014)), "[a]ll pleadings shall contain a plain and concise statement of the pleader's cause of action." The purpose of this requirement "is to give notice to the court and to the parties of the claims being presented." *Smith v. Heissinger*, 319 Ill. App. 3d 150, 154 (2001). Moreover, a complaint should contain well-pled facts and not simply mere conclusions of either fact or law. *Barham v. Knickrehm*, 277 Ill. App. 3d 1034, 1037 (1996). Under section 2-612(a) of the Code (735 ILCS 5/2-612(a) (West 2014)), "[i]f any pleading is insufficient in substance or form the court may order a fuller or more particular statement" or "[i]f the pleadings do not sufficiently define the issues the court may order other pleadings prepared." Based on this section of the Code, "[t]here is little question that a trial court has the authority, on its own motion, to strike a complaint that is insufficient in substance or fails to sufficiently define the issues and order that other pleadings be prepared." *Mitchell v. Norman James Construction Co.*, 291 Ill. App. 3d 927, 937-38 (1997). We review the court's *sua sponte* striking of a pleading *de novo*. *Wells v. Endicott*, 2013 IL App (5th) 110570, ¶ 65.

¶ 67    In this case, the circuit court essentially found plaintiffs' initial complaint lacking in sufficient form to be fully comprehensible by not only it but also the various defendants. Although plaintiffs focus on only counts I, V, and VI of their initial complaint, we agree with

the court's decision to *sua sponte* strike the entire complaint. Plaintiffs' complaint was incredibly lengthy and consisted of 254 paragraphs containing nine counts directed against several defendants. The complaint lacked a coherent organization, especially when plaintiffs provided their statement of facts, which oftentimes failed to contain relevant dates and therefore presented challenges in following along chronologically. In addition, many of the paragraphs in the complaint were overly lengthy, repetitious, and frequently intermingled facts and legal argument.

¶ 68        For example, plaintiffs very first paragraph under their "Statement of Facts" stated that:

> "Plaintiffs' claims against the defendants arise from a fraudulent scheme devised and orchestrated by FedEx, in connection with the restructuring of its Ground and [home delivery] divisions, to defraud Rocha and other FedEx contractors of contractual rights, vehicles, choses in action, and other business property by means of (1) false and illusory promises of money and an 'Independent Service Provider' ('ISP') contract with FedEx Ground said to be worth over $1 million and (2) the threat of financial ruin and other economic harm to those choosing not to cooperate and otherwise submit to its plan for restructuring."

These are obviously not facts but rather legal conclusions. Having reviewed plaintiffs' initial complaint multiple times, we, like the circuit court, had a difficult time in understanding the exact nature and scope of the allegation therein. Simply put, plaintiffs' complaint was verbose and at times incomprehensible. See *Zagar v. Gomberg*, 66 Ill. App. 3d 611, 612-13 (1978) (finding the circuit court properly dismissed a plaintiff's second amended complaint where it was "somewhat incomprehensible" and "consist[ed] of conclusions of both law and fact rather than material allegations of fact supporting her cause of action").

¶ 69        Notably, the circuit court was not even the first legal body to have difficulty understanding plaintiffs' allegations. As mentioned, plaintiffs originally brought a lawsuit against many of the defendants in the instant litigation in federal court. See *Rocha*, 15 F. Supp. 3d 796. On motions to dismiss filed by several of the defendants, the federal court initially remarked that plaintiffs' complaint was " 'an egregious violation of [Federal Rule of Civil Procedure] 8(a).' " *Id.* at 805-806 (quoting *Hartz*, 919 F.2d at 471). In part, Rule 8(a)(2) demands that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In finding that plaintiffs' complaint violated the rule, the federal court observed:

> "The sheer volume and repetitiveness of Plaintiffs' complaint raises Rule 8 concerns, as does the fact that many of Plaintiffs' 'facts' are actually legal conclusions. This Court has better things to do than 'to fish a gold coin from a bucket of mud,' and the Court would be justified dismissing this complaint based solely upon its violation of Rule 8(a)." *Rocha*, 15 F. Supp. 3d at 806 (quoting *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003)).

¶ 70        Although the federal court ultimately did not dismiss plaintiffs' complaint based on Rule 8(a) and did so based on their failure to state claims upon which relief may be granted and on other grounds (see *id.* at 806-13), the court's comments are illustrative of the issues the circuit court faced when reviewing plaintiffs' initial complaint in this case. Moreover, although plaintiffs argue at length that their initial complaint sufficiently stated causes of action for breach of contract, a violation of the Deceptive Practices Act, and a violation of the Opportunity Sales Law, this argument misunderstands the court's primary reason for

*sua sponte* striking the complaint. The court found the complaint disorganized and incoherent in several places, meaning it could not sufficiently understand what plaintiffs were alleging to even determine whether their complaint sufficiently stated causes of action for breach of contract, a violation of the Deceptive Practices Act, or a violation of the Opportunity Sales Law. Given the various problems of plaintiffs' initial complaint, the circuit court was justified in *sua sponte* striking it. Notably, the court granted plaintiffs' leave to file an amended complaint and, in doing so, its objective was to have the issues of the case properly defined for both it and the defendants. See *Rubino v. Circuit City Stores, Inc.*, 324 Ill. App. 3d 931, 940-41 (2001) (finding a plaintiff's complaint violated section 2-603 of the Code because it was "impossible for the defendants to understand plaintiff's allegations and adequately respond"). The circuit court did not err by *sua sponte* striking plaintiffs' initial complaint.

¶ 71                                    C. Motion for Substitution of Judge

¶ 72        Plaintiffs next contend that the circuit court erred in denying their motion for a substitution of judge where they were entitled to a substitution as a right because they moved for the substitution before a substantial ruling had been made in the case.

¶ 73        Under section 2-1001(a)(2)(ii) of the Code (735 ILCS 5/2-1001(a)(2)(ii) (West 2014)), a litigant is entitled to one substitution of judge as of right when he or she "timely exercises" the right and the motion is made before the circuit court has "ruled on any substantial issue in the case." When a motion for a substitution of judge as of right is properly made, the "right is absolute, and the circuit court has no discretion to deny the motion." *Bowman v. Ottney*, 2015 IL 119000, ¶ 17. The statute requires the motion be made timely to prevent parties from shopping judges "by seeking a substitution after they have formed an opinion that the judge may be unfavorably disposed toward the merits of their case." *Petalino v. Williams*, 2016 IL App (1st) 151861, ¶ 18. The court will have ruled on a substantial issue in the case if the ruling directly relates to the merits of the case. *Id.* Examples of rulings on substantial issues include where the court has made pretrial rulings of law, ruled on a motion to dismiss (*Colagrossi v. Royal Bank of Scotland*, 2016 IL App (1st) 142216, ¶ 30), or ruled on a motion for a preliminary injunction (*Chavis v. Woodworker's Shop, Inc.*, 2018 IL App (3d) 170729, ¶ 13). Examples of rulings on nonsubstantive issues include granting continuances on motions or holding a party in criminal contempt of court based on an inappropriate remark made in open court. *Id.* ¶¶ 13-14.

¶ 74        Yet, even if the circuit court has not ruled on any substantial issue in the case, the court may deny a motion for a substitution of judge if the moving party "had an opportunity to 'test the waters' and form an opinion as to the judge's reaction to her claim." *In re Estate of Gay*, 353 Ill. App. 3d 341, 343 (2004). Thus, a party's motion may still be deemed untimely if the motion was made after pretrial conferences where substantive issues had been discussed yet not decided. *Id.* Although the statute permitting a substitution of judge must be construed "as favoring substitution," the statute "does not require a construction that permits a party to engage in 'judge shopping.' " *Bowman*, 2015 IL 119000, ¶ 18. As such, while not expressly permitted by statute, the court may consider "the circumstances surrounding a motion for substitution of judge." *Id.*

¶ 75        It is important to note, however, that in *Bowman*, our supreme court observed that the "test the waters" doctrine "has been discredited and rejected" by some Illinois courts. *Id.* ¶ 5 (citing *Schnepf v. Schnepf*, 2013 IL App (4th) 121142). Though our supreme court made this

observation, it did not need to resolve the case based on the doctrine and did not address whether the doctrine was still valid. See *id.* ¶ 27. We further note that there is a split among the districts of the appellate court regarding the continued validity of the doctrine. Compare *Schnepf*, 2013 IL App (4th) 121142, ¶ 27 (finding that, where the movant has satisfied the statutory prerequisites for a substitution of judge, the motion must be granted), with *Partipilo v. Partipilo*, 331 Ill. App. 3d 394, 398 (2002) ("Even when the court has not ruled on a substantial issue, a motion for substitution of judge should be denied if the moving party had an opportunity to test the waters and form an opinion as to the court's reaction to his or her claim."); see *Colagrossi*, 2016 IL App (1st) 142216, ¶ 36 (noting the split of authority). Where there is a split of authority, the circuit court is bound to follow the decisions of the appellate court district in which it sits. *Colagrossi*, 2016 IL App (1st) 142216, ¶ 36. Therefore, in the circuit court of Cook County, the denial of a motion for a substitution of judge based on the "test the waters" doctrine continues to be a valid justification. We review the circuit court's denial of a motion for a substitution of judge *de novo. Id.* ¶ 29.

¶ 76 In this case, the circuit court primarily denied plaintiffs' motion for a substitution of judge because it had made a substantive ruling by *sua sponte* striking their initial complaint. As stated by the court, the striking of their complaint was "as if" it "had considered and granted" the defendants' motions to dismiss. The court's striking of plaintiffs' initial complaint was a substantive ruling. See *Swanson v. Randall*, 30 Ill. 2d 194, 198 (1964) (finding that, in the context of a petition for a change of venue, "[t]he denial of [the defendant's] motion to strike was such a substantive ruling"); *In re Marriage of Abma*, 308 Ill. App. 3d 605, 610 (1999) ("[A] ruling on a motion to strike and dismiss the opposing party's complaint has been deemed a substantial issue."); *Hartnett v. Stack*, 241 Ill. App. 3d 157, 168 (1993) (finding the circuit court's partial grant of a defendant's motion to strike the plaintiff's complaint a substantive ruling). Although the court struck plaintiffs' complaint *sua sponte*, what preceded the court's decision was a substantive review of the pleading in order to understand the issues of the case. Although the court was unable to precisely understand the nature of the claims due to the complaint's verbosity and disorganization, it nevertheless attempted to understand them. Consequently, the circuit court properly denied plaintiffs' motion for a substitution of judge.

¶ 77 However, even if the circuit court's *sua sponte* striking of plaintiffs' initial complaint was not a substantive ruling, the court alternatively found that plaintiffs' motion was an attempt at "testing the waters" and thus judge shopping. Based upon the circumstances of the case, including that plaintiffs' motion was filed 7 months after the court had *sua sponte* struck their complaint and 13 months after their initial complaint was filed, the court had reasonable concerns that plaintiffs were judge shopping. See *In re Estate of Gay*, 353 Ill. App. 3d at 343 (finding that, even if the circuit court has not made a substantive ruling, it may deny a motion for a substitution of judge if the moving party "had an opportunity to 'test the waters' and form an opinion as to the judge's reaction to her claim"). Consequently, on this alternative basis, the circuit court could have properly denied plaintiffs' motion for a substitution of judge.

¶ 78                              D. The DSM Defendants' Motion to Dismiss

¶ 79 Plaintiffs next contend that the circuit court erred in dismissing their cause of action against the DSM defendants—count VIII of their third partially amended complaint—with prejudice where the cause of action was not barred by the statute of limitations. As previously discussed, count VIII of plaintiffs' third partially amended complaint was labeled as a claim for

conversion against the DSM defendants for their failure to return legal files, business documents related to Arize 11's asset sale, and compensation from the asset sale.[3]

¶ 80    A motion to dismiss under section 2-619 of the Code (735 ILCS 5/2-619 (West 2014)) admits the legal sufficiency of the complaint but asserts that certain defects, defenses, or other affirmative matters that appear outside the pleadings act to defeat the claims. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. One such matter is where "the action was not commenced within the time limited by law." 735 ILCS 5/2-619(a)(5) (West 2014). In analyzing a section 2-619 motion, the circuit court is required to accept all well-pled facts in the complaint as true, as well as any reasonable inferences from those facts. *Sandholm*, 2012 IL 111443, ¶ 55. All pleadings and supporting documents must be construed in the light most favorable to the nonmoving party. *Id.* The critical inquiry is "whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993). We review a motion to dismiss *de novo*. *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 115 (2008).

¶ 81    Under section 13-214.3(b) of the Code (735 ILCS 5/13-214.3(b) (West 2014)),

> "[a]n action for damages based on tort, contract, or otherwise (i) against an attorney arising out of an act or omission in the performance of professional services *** must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought."

The reach of section 13-214.3(b) is great, as "the plain language of the statute directs that the two-year limitation applies to all claims against an attorney arising out of acts or omissions in the performance of professional services, and not just legal malpractice claims or claims brought against an attorney by a client." *800 South Wells Commercial, LLC v. Horwood Marcus & Berk Chartered*, 2013 IL App (1st) 123660, ¶ 13; see also *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 23 (observing that the broad language of the statute "encompasses a number of potential causes of action in addition to legal malpractice"); *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, ¶ 12 (remarking that the statute "applies to any claim concerning an attorney's professional services and not just cases where the attorney rendered services to the plaintiff").

¶ 82    In this case, plaintiffs' claims against the DSM defendants clearly arise out of acts or omissions by them in their performance of legal professional services. As noted by the DSM defendants, plaintiffs' third partially amended complaint was replete with allegations related to the DSM defendants' performance of legal services. For example, in one paragraph concerning the alleged conversion of documents, plaintiffs' alleged that "Deer thereafter, without Rocha's consent, transferred some or all of Plaintiffs' original files and documents to Rojas, including those prepared by DSM in the course of legal services provided and original documents delivered to DSM by Rocha." In another paragraph related to the withholding of documents, plaintiffs' alleged that "[a]fter being informed of a sale or partial sale of Arize 11's assets in March 2011, Plaintiffs made repeated demands of DSM for the sale agreement and other documents prepared on their behalf in connection with that sale and neither Deer nor Stone complied." Similarly, in a paragraph related to the DSM defendants' failure to provide

---

[3]Count VIII also contained a cause of action for conversion against Rojas, which was dismissed by the circuit court with prejudice. Plaintiffs do not challenge that ruling.

Rocha money from the sale of Arize 11's assets, plaintiffs alleged that they "had an unqualified right to discharge the DSM Defendants and, upon discharge, Deer, Stone and DSM could retain only what was reasonable in light of the services they had actually performed for Plaintiffs prior to being discharged." Additionally, in plaintiffs' brief, they described their cause of action for conversion against the DSM defendants as "aris[ing] *solely* from the DSM Defendants' assumption of unauthorized control and dominion over undisbursed amounts deposited in DSM's client trust account for Plaintiffs and Plaintiffs' legal files and other documents never returned on account of DSM's unsubstantiated claim for fees." (Emphasis added.) By plaintiffs' own words, the allegations against the DSM defendants concerned their acts and omissions in the course of professional legal services.

¶ 83 Although plaintiffs argue that their cause of action does not arise out of the performance of legal services because the DSM defendants failed to perform requested legal services, including failing to file a lawsuit against FedEx, these alleged inactions by the DSM defendants were undoubtedly omissions by them in their performance of professional legal services. See *McIntosh v. Cueto*, 323 Ill. App. 3d 384, 385, 391-92 (2001) (finding a lawsuit against attorneys for failing to timely file a medical malpractice action governed by two-year statute of limitations in section 13-214.3 of the Code). Plaintiffs also claim that the DSM defendants never actually represented them in the sale of Arize 11's assets and rely on an affidavit from Rocha that they attached to their response to the DSM defendants' motion to dismiss. In that affidavit, Rocha averred that the asset sale was fraudulently perpetrated without his knowledge and he only learned of the sale's completion after the fact. However, that averment is directly contradicted by the termination letter he sent to the DSM defendants, wherein he asserted that he had paid them "$2500 to protect my and Arize 11, Inc[.]'s interests in the asset sale." What is clear is that all of plaintiffs' allegations and claims against the DSM defendants stem from their initial representation of them. See *800 South Wells Commercial*, 2013 IL App (1st) 123660, ¶ 13 (finding the plain language section 13-214.3(b) "directs that the two-year limitation applies to *all* claims against an attorney arising out of acts or omissions in the performance of professional services" (emphasis added)). Consequently, the circuit court correctly concluded that the two-year statute of limitations found in section 13-214.3(b) of the Code applied to plaintiffs' cause of action against the DSM defendants.

¶ 84 Having determined the statute of limitations in section 13-214.3(b) applied, we now must determine whether plaintiffs brought their cause of action against the DSM defendants "within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2014). Section 13-214.3(b) incorporates the discovery rule (*Doyle v. Hood*, 2018 IL App (2d) 171041, ¶ 20), which serves to toll the statute of limitations period "until the injured party knows or reasonably should know of the injury and knows or reasonably should know that the injury was wrongfully caused." *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 20. "A person knows or reasonably should know an injury is 'wrongfully caused' when he or she possesses sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct had occurred." *Janousek*, 2015 IL App (1st) 142989, ¶ 13 (citing *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 1011 (2002)).

¶ 85 Given the similarity of the allegations in the termination letter sent by Rocha to Deer in May 2012 to the allegations raised by plaintiffs against the DSM defendants in count VIII of the third partially amended complaint, plaintiffs possessed sufficient information concerning

an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct occurred. It is certainly arguable that the allegations and claims contained in count VIII showed that plaintiffs did not learn the full extent of the alleged harm caused by the DSM defendants until some point after Rocha sent the termination letter. But, under the discovery rule, "the limitations period commences when the plaintiff is injured, rather than when the plaintiff realizes the consequences of the injury or the full extent of her injuries." *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 364 (1995). As the circuit court correctly found, the statute of limitations period against the DSM defendants commenced at the latest in May 2012, when Rocha sent the termination letter.

¶ 86    Although plaintiffs argue that there is an argument to be made that the statute of limitations should have tolled in this case due to their need for discovery as it related to the relationship between the DSM defendants and Velez, they fail to cite any case law supporting this assertion. As such, the argument is forfeited. See *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 (observing that the failure to cite relevant legal authority results in forfeiture of the argument). Furthermore, plaintiffs argue that the DSM defendants fraudulently concealed the elements of plaintiffs' cause of action, which also would toll the commencement of the statute of limitations. See 735 ILCS 5/13-215 (West 2014) ("If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards."). In particular, plaintiffs posit that the DSM defendants "misled" them by fabricating a claim for fees and thus keeping the $27,000 from the sale of Arize 11's assets. But "[a] plaintiff seeking to avail itself of this provision to toll the statute of limitations must show that the defendant engaged in affirmative acts or representations designed to prevent discovery of the cause of action or to induce the plaintiff into delaying the filing of its claim." *J.S. Reimer, Inc. v. Village of Orland Hills*, 2013 IL App (1st) 120106, ¶ 51. That did not occur here, where again the termination letter sent by Rocha to Deer clearly showed that, all along, Rocha believed the DSM defendants were withholding money from him that they did not rightfully earn. Because plaintiffs cause of action against the DSM defendants commenced at the latest in May 2012 and they waited until January 2015 to file their initial complaint, they did not bring forth their cause of action against the DSM defendants within two years, as required by the statute of limitations. Consequently, the circuit court correctly found count VIII time-barred and properly granted the DSM defendants' motion to dismiss.

¶ 87                    E. FXG's Motion for Partial Summary Judgment

¶ 88    Plaintiffs next contend that the circuit court erred in several manners with respect to ruling on FXG's motion for partial summary judgment, which FXG made toward counts II, III, IV and part of count X.

¶ 89                    1. Count II—Breach of Contract

¶ 90    Plaintiffs first argue that the circuit court erred in granting summary judgment to FXG on count II of their fourth amended complaint by ruling as a matter of law that the ISP transition guide contained no offer Rocha could accept. Plaintiffs acknowledge that the transition guide expressly noted that the award of an ISP agreement was not guaranteed, but they posit that the

- 22 -

opportunity to negotiate for an agreement was guaranteed if Rocha fulfilled the conditions set forth in the transition guide.

¶ 91    The transition guide was, as its name implied, a guide describing FedEx's transition from the independent contractor model to the ISP model and discussing the options current FedEx contractors had as the transition occurred. In a section of the guide titled "Contractor Options," FedEx stated that "[c]ontractors affected by this transition have several options to choose from," including to "pursue an ISP Agreement," "seek employment with an ISP," or "exit the network" entirely. The guide, however, focused on how contractors could pursue an ISP agreement, which involved "several steps" to be eligible to negotiate an ISP agreement. According to the guide, the first major deadline was November 19, 2010, by which time an ISP candidate must have incorporated, established an entity profile on a FedEx website and obtained three service areas. However, the guide noted in a "Q&A" portion that the acquisition of three service areas did not "automatically guarantee that ISP Candidates will be able to successfully negotiate and enter into an ISP Agreement." If this initial deadline was met, an ISP candidate would be able to "begin the [request for information] Process," which helped FedEx "assess whether an ISP Candidate ha[d] the ability to fulfill the obligations of an ISP Agreement."

¶ 92    According to the transition guide, ISP candidates would be required to submit a response to FedEx's request for information through its online platform. This response would include information about an ISP candidate's business experience, financial viability, customer service approach, driver recruitment and retention approach, and various other matters relevant to being an ISP. The guide informed ISP candidates that, "[o]nce the [request for information] Response is submitted, a Senior Manager will evaluate the response and make one of the following decisions," which were (1) allowing the ISP candidate to "advance to negotiations," (2) requesting "clarification" or asking further "questions" about the ISP candidate's ability to fulfill the obligations of an ISP agreement, or (3) determining that the ISP candidate "does not advance to negotiations." The final possibility would occur if the "Senior Manager determines the ISP Candidate does not have the ability to fulfill the obligations" of an ISP agreement.

¶ 93    The guide continued and stated that, "[a]fter advancing through the [request for information] Process and onto the Negotiations Process," additional requirements would have to be met before FedEx and an ISP candidate reached an ISP agreement. The next step, according to the guide, was "the preparation and submission of a Proposal" to FedEx. The guide remarked that the proposal was "an initial offer on the key financial, non-financial, and elective components of an ISP Agreement." And once a proposal had been submitted to FedEx, a negotiator would be assigned to the proposal and negotiations would commence. However, the guide cautioned that, even if a candidate advanced to negotiations, there was no guarantee of successful negotiations. The guide further stated that, "[i]nitially, competitive bidding between ISP Candidates is not expected to take place" as "the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement." The guide added that FedEx

> "may seek multiple bids for the same [contracted service areas] only in the event the ISP Candidate's and [FedEx's] negotiations reach impasse, or in the event the ISP Candidate does not meet certain transition deadlines that have been put in place in order to ensure the transition can be completed in a sufficient time to protect against service disruptions."

¶ 94    Disposing of litigation on a motion for "[s]ummary judgment is a drastic" measure, and such a motion "should be granted only when the movant's right to judgment is clear and free from doubt." *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 45. Specifically, the circuit court should only grant summary judgment where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law. *Gurba v. Community High School District No. 155*, 2015 IL 118332, ¶ 10. A genuine issue of material fact exists where the material facts are disputed or reasonable people could draw different inferences from the undisputed facts. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. We review the court's ruling on a motion for summary judgment *de novo*. *Gurba*, 2015 IL 118332, ¶ 10.

¶ 95    In order to establish a breach of contract, the plaintiff must prove (1) a valid and enforceable contract exists, (2) he substantially performed, (3) the defendant committed a breach, and (4) resulting damages. *Bankers Life & Casualty Co. v. American Senior Benefits LLC*, 2017 IL App (1st) 160687, ¶ 15. Because the court's ruling involved the first element, we will focus on it. Under Illinois law, a company's written statements—oftentimes employee handbooks but occasionally policy statements—can create an enforceable contract if (1) the language of the statement contains "a promise clear enough that a [person] would reasonably believe that an offer has been made," (2) the statement was disseminated to the person in a way that he was aware of its contents and reasonably believed the statement to be an offer, and (3) the person accepts the offer by continuing or beginning work after learning of the statement. *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 490 (1987). If all three requirements are met, the person's work "constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed." *Id.*

¶ 96    Given the language of the transition guide, plaintiffs rightfully concede that the guide in no way promised or offered a guarantee for successful negotiations for an ISP agreement. However, plaintiffs posit that the guide did promise or offer a guarantee for exclusive negotiations for an ISP agreement. Initially, it is dubious that the transition guide contained a promise clear enough that a person reasonably would believe that an offer for an exclusive negotiation window was made. The guide explicitly stated that, upon an ISP candidate submitting a response to FedEx's request for information, a senior manager may allow that candidate to advance to negotiations, may request additional information, or may preclude the candidate from advancing to negotiations. The latter being the case if the manager determines that the "ISP Candidate does not have the ability to fulfill the obligations" of an ISP agreement. Given this unfettered discretion afforded to the senior manager, in particular his or her ability to preclude an ISP candidate from advancing to negotiations entirely, we do not believe it was reasonably clear that an offer had been made for exclusive negotiations. And if no offer was ever made, no valid and enforceable contract could be created based upon the transition guide. See *id.*

¶ 97    However, assuming *arguendo* that the transition guide contained an offer for an exclusive right to negotiate an ISP agreement for a certain geographical area if Rocha satisfied certain requirements, he failed to satisfy the condition precedents to obtain the exclusive right of negotiations. "A 'condition precedent is one that must be met before a contract becomes effective ***.' " *Catholic Charities of the Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 307 (2000) (quoting *McAnelly v. Graves*, 126 Ill. App. 3d 528, 532 (1984)). In support of

- 24 -

FXG's motion for summary judgment, it attached an affidavit of Watts, the senior manager for FXG's Chicago terminal. In the affidavit, Watts averred that, in his role, he had the responsibility to ensure that ISP candidates complied with the various requirements to become eligible to negotiate an ISP agreement. While Watts noted that Rocha had obtained three service routes, Watts asserted that Rocha never submitted a response to FedEx's request for information. Nothing in the record contradicts Watts's assertion. "[F]acts contained in an affidavit in support of a motion for summary judgment which are not contradicted by counteraffidavit are admitted and must be taken as true for purposes of the motion." *Purtill v. Hess*, 111 Ill. 2d 229, 241 (1986). Because we must accept Watts's assertion as true, Rocha failed to submit a response to FedEx's request for information, which clearly was a condition precedent to any alleged agreement for an exclusive negotiation window. As such, no contract was formed between Rocha and FedEx (see *Catholic Charities*, 318 Ill. App. 3d at 307), and there can be no breach of contract. See *Bankers Life*, 2017 IL App (1st) 160687, ¶ 15. Although the circuit court did not rely on this reason for granting FXG summary judgment on count II, we may affirm the court on any basis supported by the record. See *Mutual Management Services, Inc. v. Swalve*, 2011 IL App (2d) 100778, ¶ 11.

¶ 98    Furthermore, to the extent plaintiffs argue that FXG breached its duty of good faith and fair dealing, we note that an independent tort for such conduct does not exist except in narrow circumstances involving insurance obligations. See *7-Eleven, Inc. v. Dar*, 325 Ill. App. 3d 399, 409 (2001). Rather, the duty of good faith and fair dealing is an implied duty in every contract (*JPMorgan Chase Bank, N.A. v. East-West Logistics, L.L.C.*, 2014 IL App (1st) 121111, ¶ 48), and if there is no contract, there can be no breach of this implied duty. See *Magna Bank of Madison County v. Jameson*, 237 Ill. App. 3d 614, 618 (1992) (remarking that the "implied covenant of good faith and fair dealing" "does not exist until a contractual relationship exists"). Consequently, the circuit court properly granted FXG summary judgment on count II.

¶ 99                                    2. Count III—Fraudulent Inducement

¶ 100    Plaintiffs next argue that the circuit court erred in granting summary judgment to FXG on count III of their fourth amended complaint by ruling as a matter of law that their fraudulent inducement cause of action failed. In count III, as previously discussed, plaintiffs alleged that they were fraudulently induced by FXG to execute a release of claims in exchange for the opportunity to negotiate for an ISP agreement when FXG never intended to negotiate with them.

¶ 101    However, contrary to plaintiffs' argument, the circuit court never granted summary judgment to FXG on count III. During the hearing on FXG's motion, the court stated "as to Count 3, fraudulent inducement of plaintiffs' release of claims, I'm going to have to deny the motion." Consistent with this oral pronouncement, the court held a multiday trial on this count as well as others, and provided the jury special interrogatories dedicated specifically to count III. Under the heading "Count 3 Alleged Fraudulent Inducement," the special interrogatories asked the jury a series of questions, beginning with the threshold question of: "Did Plaintiff, Carlos Rocha, prove [FXG] knowingly made false statements to him to induce him to execute the Limited Release and/or assume the costs and liability with the disputed routes?" The jury answered "No," which obviated the need for it to answer any more of the interrogatories. Consequently, the circuit court did not grant summary judgment to FXG on count III, and plaintiffs' argument is without merit.

### 3. Count IV—Promissory Estoppel

Plaintiffs next argue that the circuit court erred in granting summary judgment to FXG on count IV of their fourth amended complaint "for the same reasons already stated in opposition of [FXG's] motion to dismiss the Second and Third Causes of Action (Counts 2 and 3) of the [Fourth Amended Complaint]." In count IV, as previously discussed, plaintiffs alleged that employees of FedEx made various promises and representations to Rocha in exchange for him executing various agreements in order to make Arize 11 eligible to become an ISP.

However, contrary to plaintiffs' argument, the circuit court never granted summary judgment to FXG on count IV. During the hearing on FXG's motion, the court remarked that it could not decide count IV "as a matter of law" and allowed plaintiffs to proceed to trial relying on FedEx's alleged oral promises and representations to support its cause of action for promissory estoppel. Consistent with this oral pronouncement, the court held a multiday trial on this count as well as others and provided the jury special interrogatories dedicated specifically to count IV. Under the heading "Count 4 Alleged Promissory Estoppel," the special interrogatories asked the jury a series of questions, beginning with the threshold question of "Did Plaintiffs prove [FXG] made a promise to Carlos Rocha it did not intend to perform?" The jury answered "No," which obviated the need for it to answer any more of the interrogatories. Consequently, the circuit court did not grant summary judgment to FXG on count IV, and plaintiffs' argument is without merit.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgments of the circuit court of Cook County.

Affirmed.